GALEN SUPPES                              )

                 Plaintiff,       )

                              )

v.                                )     Case No.

                              )

Elizabeth Loboa, Phillip J. Hoskins, Garnett  )

Stokes, Curators of the University of Missouri  )

Wilson R. Freyermuth, Russell S. Jones Jr., Ian  )

P. Cooper, Patrick Pinhero, Steve J. Owens,  )

GateHouse Media, LLC, and Rudi Keller,     )

               Defendants.  )    **Jury Trial Demand**

                              )    **Request for District Judge**

                              )

## COMPLAINT

Plaintiff, Pro Se (hereafter Suppes) brings this complaint under 42 U.S.C. § 1983, 28 U.S.C. § 1338(b), and related torts on malpractice for damages resulting from Deprivation of Civil Rights, Legal Malpractice, Torts of False Light, Abuse of Process, and Unfair Practices inflicted upon Plaintiff by Defendants. The court has jurisdiction of this action (28 U.S.C. § 1343 and 28 U.S.C. § 1332) and of the parties. Venue is proper in this judicial district as most of the incidents complained of occurred in this district.

Two legal processes with transcripts, under oath, pertaining to this case include: a) The University of Missouri ("University") process for removing tenure and terminating the position of a tenured professor ("Cause-for-Dismissal") resulting in the May 25, 2017 termination of Suppes' job and b) Boone County Circuit Case No. 09BA-CV02314 ("The-Lawsuit") with jury trial concluding on September 6, 2017.

All counts have common and inseparable actions related to the handling of patentable intellectual property ("IP") at the University.

Case 2:18-cv-04230-MDH   Document 1   Filed 11/09/18   Page 1 of 42

## PARTIES

1. Plaintiff, Pro Se, Suppes ("Suppes") is a resident of the State of Missouri, currently residing at 4 Bingham, Columbia, Missouri 65203. Suppes was employed by the University as a professor in the Chemical Engineering from August 1, 2001 until May 25, 2017.

2. Defendant Elizabeth Loboa ("Loboa") is an individual who committed torts complained of herein in Boone County, Missouri, acting as an individual and acting in her official capacity as College of Engineering ("COE") Dean and/or Relator for the Cause-for-Dismissal; and may be served at: W1024G Lafferre Hall, University of Missouri, Columbia, MO 65211.

3. Defendant Phillip J. Hoskins ("Hoskins") is an individual who committed torts complained of herein in Boone County, Missouri, acting as an individual and acting in his official capacity as a counsel in the University's Office of General Counsel. He may be served at: 227 University Hall, University of Missouri, Columbia, MO 65211.

4. Defendant Garnett Stokes ("Stokes") is an individual who committed torts complained of herein in Boone County, Missouri, acting as an individual and acting in his official capacity as a Provost or Interim Chancellor; and may be served at: Office of the President, MSC05 3300, University of New Mexico, Albuquerque, NM 87131-0001.

5. Defendant The Curators of the University of Missouri ("Curators") is a public corporation of the State of Missouri including the University of Missouri, a publicly funded institute of higher education. Curators may be served with summons and complaint by serving its President, Mun Choi at: 321 University Hall, University of Missouri, Columbia, MO 65211.

6. Defendant Wilson R. Freyermuth ("Freyermuth") is an individual who committed torts complained of herein in Boone County, Missouri, acting as an individual and in his official capacity as a professor in the school of law and/or Chair of the CDF-Jury of the Cause-for-

Dismissal; and may be served at: 215 Hulston Hall, Univ. of Missouri, Columbia, MO 65211.

7. Defendant Patrick Pinhero ("Pinhero") is an individual who committed torts complained of herein in Boone County, Missouri, acting as an individual and acting in his official capacity as a professor or interim chairman in the Department of Chemical Engineering; and may be served at 1024 Lafferre Hall, University of Missouri, Columbia, MO 65211.

8. Defendant Russell S. Jones Jr. ("Jones") is a litigation attorney of Posinelli PC who represented the Curators in The-Lawsuit and who committed torts complained of herein in Boone County, Missouri, acting as an individual and in his official capacity; and may be served at: Posinelli PC, S 12th St, Kansas City, KS 66103.

9. Defendant Ian P. Cooper ("Cooper") is a litigation attorney of Tueth Keeney P.C. who represented the Curators in the Cause-for Dismissal and who committed torts complained of herein in Boone County, Missouri, acting as an individual and in his official capacity; and may be served at: 34 N. Meramec Ave., Ste. 600, St. Louis, MO 63105.

10. Defendant Steve J. Owens ("Owens") is an individual who committed torts complained of herein in Boone County, Missouri, acting as an individual and acting in his official capacity as General Counsel in the University's Office of General Counsel. He may be served at: 227 University Hall, University of Missouri, Columbia, MO 65211.

11. Defendant GateHouse Media, LLC is the owner of copyright of The Columbia Daily Tribune ("Tribune") which is a newspaper in Columbia, MO, and may be served at Columbia Daily Tribune, 101 N 4th St., Columbia, MO 65201.

12. Defendant Rudi Keller ("Keller") is a reporter with The Columbia Daily Tribune acting as an individual and in his official capacity; and may be served at Columbia Daily Tribune, 101 N 4th St., Columbia, MO 65201.

## JURISDICTION AND VENUE

13. Jurisdiction is invoked pursuant to 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983.

14. Venue is proper in this District under 28 U.S.C. § 1391 in that Suppes resided in this District and most of the incidents giving rise to this cause occurred in this District.

15. Federal question jurisdiction is invoked per Counts I, VIII, XI-XIV, XXIV, XXVI, and XXVII.

16. Restraint of trade with substantial patent law component is invoked per Counts IV-VI.

## OTHER COMPLAINTS AND PETITIONS

17. Except for one Associate Court cause, no other complaint or petition has been filed since February 29, 2016; whereby, the disposition of all counts in this instant case only became ripe after this date of February 29, 2016.

18. The Boone County Associate Court Case No. 15BA-CV03064 was filed on March 27, 2018; it was on the declaratory judgment to change the University status of an invention from "processing" to a status of invented outside the scope of work. The case was dismissed in about May of 2018 with prejudice and without explanation of judgment rationale.

19. Three previous cases have been filed by Suppes in Missouri's Western District Court.

20. Case No. 15-4095-Cv-C-MJW (SUPPES vs CURATORS, Suppes' first filing of a district case;) was filed on May 7, 2015, and was on declaratory judgment of ownership of rights to a patent application; it was dismissed as a case of Federal Question in lieu of judgment it was a contract issue with state court jurisdiction. Within about a week of dismissal from federal court, the University acknowledged in writing a non-assertion of rights to the patent application. As documented in hearing transcripts (Case No. 15-4095-Cv-C-MJW,SUPPES vs CURATORS, DOC 38), the honorable Judge M. Douglas Harpool instructed to the Curator's attorneys with

Case 2:18-cv-04230-MDH   Document 1   Filed 11/09/18   Page 4 of 42

reference to the University's Collected Rules and Regulations ("CRR"):

> [pages 108, lines 4-8] THE COURT: You need to tell the general counsel of the university that and you need to tell the Board of Curators that. There's nothing in here [referring to the CRR] that says we don't have to make a decision [on whether or not to assert rights to an invention] until we're in a position to legally protect our rights.

> [pages 108-109, lines 22-2] [THE COURT:] Now, I'll be honest with you, I'm not sure this Court is the -- to me you're [Curators] in breach of your employment contract with him [Suppes] because it infers that you're going to in good faith evaluate his claim of -- that you have no interest and you can't just permanently delay that until he gives you everything you want. Now, that doesn't solve my problem here.

21. Following the dismissal of Case No. 15-4095-Cv-C-MJW, Suppes amended the complaint and filed it as state court petition Boone County Circuit Case No. 15BA-CV03064 (vs Knedlik et al) on 09/11/2015 which was dismissed without prejudice on July 17, 2017 for failure to prosecute.

22. District Case No. 2:16-cv-04023-MJW (SUPPES vs CURATORS, Suppes' second filing of district case) was filed in about January of 2016 on the Federal Question on the right to own an "invention"; it was dismissed based on issue of a public corporation not being at fault for violating constitutional rights (1983 violations must be against individuals, not a public corporation).

23. Case No. 2:16-cv-4235-MJW (SUPPES vs FENDER & KATTI, Suppes' 3rd filing of district case) was filed in August of 2016 against The University on the Federal Question on related to ownership of inventions that had not risen to the level of a patent application; it was dismissed based on the disposition of invention ownership being a contract issue with state law jurisdiction. Suppes appealed the court's decision; the court's decision was upheld.

24. Related counts of this instant complaint are on alleged violations of Restraint of Trade and are distinct from Case No. 2:16-cv-4235-MJW which was on the federal question

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 5 of 42

relative to owning "inventions". More specifically, the Curator's pursuit of ownership of inventions is like a two-edged sword: a) on the one hand the Curators attempt to gain value of intellectual property [invention] ownership not covered by patent law and non-compete statutes, while on the other hand, b) overly ambitious pursuits of dominion over faculty members' intellectual properties restrain the trades of the faculty members.

25. The last allowed counterclaim for actions against Suppes in Boone County Circuit Case No. 09BA-CV02314 was on about November, 11, 2010; a further request for amendment of the counterclaim was denied.

26. For all counts of this instant complaint:

    a. breaches and causes occurred after November 11, 2010 and

    b. the damages occurred, were substantially escalated, and/or became reasonably discoverable to Suppes in May through October of 2017.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

**Background:**

27. On August 1, 2001, Suppes assumed a faculty position at the University with tenure, as an Associate Professor of Chemical Engineering in 9-month appointments.

28. On May 25, 2017 Suppes was terminated from his professorial appointment.

29. On September 6, 2017 The-Lawsuit culminated in a jury verdict against Suppes.

30. Suppes was subject to annual FAIR evaluations to determine salary raises; the FAIR guidelines were by agreement confirmed annually for each year of Suppes' employment.

31. The FAIR agreement criteria had a default basis of 40% on research, 40% on teaching, and 20% on service. The teaching component was further separated into aspects of course load, teaching publications, advancement of teaching methods, assessment of student learning, and student evaluations.

Case 2:18-cv-04230-MDH   Document 1   Filed 11/09/18   Page 6 of 42

32. A contract pertaining to this case is the University's CRR including binding aspects from August 1, 2001 with inventor rights continuing past 2018.

33. CRR330.020(B) states:

The University of Missouri should not and will not require that either faculty members or students give up any of their constitutional rights as citizens in order to remain associated with the University as employee or student.

34. Sections of the CRR that apply to this instant complaint include but are not limited to: 100.020 Patent and Plant Variety Regulations, 110.010 Regulations, 300.010 Faculty Bylaws of the University of Missouri-Columbia, 310.010 Academic Freedom and Economic Security of Academic Staff, 310.015 Procedures for Review of Faculty Performance, 310.020 Regulations Governing Application of Tenure, 310.050 Faculty Committees on Tenure, 310.060 Procedures in Case of Dismissal for Cause, 330.020 Civic Responsibility, and 370.010 Academic Grievance Procedure.

35. CRR100.020 discusses disclosure of inventions separate from assignment of inventions.

36. CRR100.020.D.1.a of the CRR states:

Each Employee of the University is required and shall upon request assign to The Curators of the University of Missouri all domestic and foreign rights to any Invention or Plant Variety made by the Employee within the general scope of her/his duties as Employee of the University,

37. CRR100.020.D.1.b of the CRR states:

An Employee of the University shall be entitled to all rights resulting from any Invention or Plant Variety which was made by her/him outside the general scope of her/his University duties,

38. CRR100.020.E.2.c of the CRR states:

If an Employee-inventor shall claim an Invention or Plant Variety as her/his own, the Patent Administrator shall refer such claims to the Patent Committee. The Patent Committee shall afford the Employee-inventor the opportunity to appear before the committee to present such evidence relating thereto as he/she may have or the committee

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 7 of 42

may desire and the committee may make an independent investigation of said claim. Based on these findings, the committee shall make appropriate recommendations in writing to the President of the University for appropriate action.

39. The CRR does not state that the University has the right to take away personal property from an employee such as a patent application for an invention made outside the general scope of the employee's duties.

40. In the event the President of the University decides to assert rights on an invention on which an employee also decides to assert ownership by filing for patent, the President has at least two legal options to protect interests of the University, including:

   a. Filing for patent with ownership asserted by USTO provisions allowing for an Substitute Statement and

   b. Filing for Declaratory judgment in Associate Court at a cost of about $30 and with judgments typically ordered within in a few months.

41. In January of 2008, Suppes filed the 08-Grievance to invoke Faculty Advisory Authority in an effort to end University practices that were outside those practices prescribed by the CRR.

**The-Lawsuit (related and procedural incidents)**

42. In January of 2009, the University filed The-Lawsuit which set in motion an 8.5 year legal process costing over $1.5 million in costs and fees with trial with jury verdict rendered in September of 2017; related legal costs and bills continue to accrue.

43. During the time period from 2001 through 2017 disputes and animosity developed on topics of: i) failure of the University to follow through on reasonable expectations relative to providing research laboratories to Suppes, ii) handling of patentable intellectual property, iii) unevenly applied criteria on promotion and awards, iv) fraudulent reporting of research expenditures by Pinhero with resulting impact on evaluations, v) up to about half the faculty in the chemical engineering department not having proper qualifications for teaching core chemical

Case 2:18-cv-04230-MDH   Document 1   Filed 11/09/18   Page 8 of 42

engineering courses, and vi) Suppes reporting tens of millions of dollars of university

administration budgets without milestones of performance readily available to faculty.

44.     Administrators whose job would normally be resolve disputes were polarized

against Suppes.

45.     The administrators failed to resolve disputes in lieu of compiling data.

46.     In The-Lawsuit, Suppes was attributed with the cause for The-Abandoned-

Application; however, Suppes did not file the document causing abandonment.  The document

that should have been filed to prevent abandonment is referred to as a Substitute Statement

which is defined by 35 US Code § 115(d)(2)(B) as follows:

(d) Substitute Statement.—
(1) In general.—In lieu of executing an oath or declaration under subsection (a), the
    applicant for patent may provide a substitute statement under the circumstances
    described in paragraph (2) and such additional circumstances that the Director may
    specify by regulation.
(2) Permitted circumstances.—A substitute statement under paragraph (1) is permitted
    with respect to any individual who—
        (A) is unable to file the oath or declaration under subsection (a) because the
            individual—
                (i) is deceased;
                (ii) is under legal incapacity; or
                (iii) cannot be found or reached after diligent effort; or
        (B) is under an obligation to assign the invention but has refused to make the oath
            or declaration required under subsection (a).

## COUNTS

**Introductory Counts of Federal Jurisdiction**

### COUNT I - VIOLATION OF U.S. CONSTITUTION FIRST AMENDMENT
### FREEDOMS OF SPEECH, ASSEMBLY AND ASSOCIATION
**(Against Stokes in her Official Capacity)**

Plaintiff incorporates the proceeding paragraphs by reference herein.

47.     Stokes wrote to Suppes in the color of state law, in her authority as Interim

Chancellor of the University, and in the letter May 25, 2017:

You are required to have prior written permission from me in my role as Provost prior to coming onto campus.

48. In her email communication of May 30, 2017; Stokes clarified:

You no longer have any right or regular reason to be present at University facilities, which are for the use of University students, faculty and staff. If you have a reason to be in University buildings or on University grounds, please let me know and permission will not be unreasonably withheld. You may access University of Missouri Hospital and Clinics without a request and prior permission.

49. Stokes declared Suppes "no longer had any right" to be on campus.

50. On or about February 19, 2018, the University Chief of Police, Doug Schwandt, acting in the color of state law called Suppes three times before 8:40 AM and left a message on Suppes' cell phone informing Suppes that he (Suppes) was not allowed to go to the on-campus meeting of the local chapter of the American Association of University Professors ("AAUP") later that day without written permission.

51. The CRR describes neither a procedure nor an authority for denying a civilian the right to be on campus.

52. Relative to trespassing on the University campus, the CRR 110.010.E.3 states:

A person shall be deemed to be on University property "without an appropriate purpose" whenever their presence is not reasonably related to the University's educational function, or an approved University related extracurricular activity.

53. Stokes provided no notice that she was considering taking away Suppes' rights as a civilian to participate in approved University related extracurricular activities on campus.

54. Stokes neither provided any opportunity for a hearing on her considering taking away Suppes' rights as a civilian nor provided an opportunity to appeal her order.

55. Half the perimeter of Suppes' house is surrounded by campus property at an average of about a quarter mile distance.

56. On average, Suppes and his wife walk to downtown businesses three times a week

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 10 of 42

where the shortest and most secure route is through campus; walking is extracurricular.

57. Three major campus research libraries of common use by Suppes are about three quarters of a mile walking distance.

58. Campus libraries receive federal funding including functioning as a federal depository with express purpose of being available to the public.

59. No court issued a restraining order restricting Suppes from campus.

60. Without requirements for written permission, the general public is regularly allowed to proceed "onto campus" including access to streets, sidewalks, concerts in several building, sports events in several buildings, meetings such as AAUP meetings, a law library, an engineering library, a science library, a bookstore, an physical fitness gym/center, restaurants at numerous locations including The University Club, and other events.

61. Suppes missed about four AAUP meetings on campus since Officer Schwandt's warning; Suppes was a member of AAUP and regularly attended AAUP meetings prior to this warning at a frequency of about six times a year and often in positions of a local chapter officer. The AAUP meetings are regularly attended by former University employees.

62. A primary purpose of the AAUP meeting is open speech discussion of topics impacting university professors; Suppes was denied this open speech discussion. The AAUP group participation and activity has decreased markedly since Suppes was no longer allowed freely to attend meetings.

63. Prior to Stokes' letter taking away Suppes' free access to meetings, Suppes enjoyed association, assembly, and open speech with colleagues at the Learned Hall coffee shop on campus. Meetings are often organized on short notice of less than two hours; a time too short regularly to obtain written permission from the Provost. Others participating in the discussions would take offence and likely not participate if the meetings were announced to the Provost. The

restrictions on Suppes attending these associations has resulted in Suppes' association with several individuals to become essentially non-existent.

64.    For the academic year Fall 2017 through Spring 2018, Suppes and his wife had won three free University Club two-meal lunch buffet vouchers valued at over $100; Suppes did not use these vouchers for fear of reprisal for going onto campus; these lunch vouchers were for the lunch buffets when many administrators were using the dining facility and thus presented a high prospect for confrontation.

65.    Suppes experienced mental stress as a result of walking through campus about three times a week and when going to University Club Bistro evening dinners, University Club wine tasting about once a month, and University Club Texas Hold 'Em about once a month; despite his belief that his right to assembly and association could not be restricted in the manner attempted by Stokes.

66.    Damages included but were not limited to loss of monetary values of vouchers for fee meals, attorney fees related to this topic, and mental anguish for the unlawful denial of rights.

## COUNT II - ABUSE OF PROCESS
### (Against Stokes in her Official Capacity)

Plaintiff incorporates the proceeding paragraphs by reference herein.

67.    Stokes improperly and intentionally used the process for terminating tenure and employment for the ulterior purpose of denying Suppes' civilian rights of access to the University's campus for appropriate purposes.  She wanted to avoid bumping into Suppes after participating in a wrongful termination of Suppes' employment.

68.    Denying Suppes access to campus was the ulterior purpose of terminating Suppes' employment.

69.    Suppes seeks damages for being subjected to the termination of employment,

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 12 of 42

indignity, and humiliation of being denied the basic rights of walking on certain sidewalks and meeting with colleagues on campus including applicable punitive damages.

<u>COUNT III - BREACH OF CONTRACT:</u>
<u>CONTRACT CONVERSION TOWARD RESTRAINT OF TRADE</u>
(Against the Curators)

Plaintiff incorporates the proceeding paragraphs by reference herein.

70. University practices converted ("Conversion") the CRR from an agreement based on patenting to demands for perpetual invention ownerships where the University claimed ownerships on inventions, even when the University decided not to patent the inventions.

71. Whereas patenting establishes a title of ownership to intellectual property broadly impacting populations for a limited time period, the University's practice of ownership of Suppes' inventions without patent establishes dominion only over Suppes.

72. Claims of rights to Suppes' inventions that are not protected by patent, are claims to the trade and/or expertise of Suppes and only against Suppes.

73. The University's demand for and practice of perpetual ownership of inventions is a wrongful ownership improperly circumventing centuries of case law (on patents and non-compete clauses) that establish limits to time and dominion of ownership on intellectual property.

74. Since about April of 2012, under threat of terminating his employment, the University demanded ownership of "all improvements thereto" on Suppes' inventions as documented by assignment forms prepared by the University upon which signatures from Suppes were demanded.

75. The CRR contains no provisions on "improvements thereto" to inventions.

76. The assignment clause of "all improvements thereto":

a. is a monopoly of expertise over Suppes on the invention topics,

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 13 of 42

b.   applies to inventions even when patent was not pursued, and

c.   applies to inventions where patent was pursued even after expiration or abandonment of patent and/or application.

77.   Of approximately 89 inventions between January of 2011 and May of 2017:

a.   approximately 8 assignment forms containing the "all improvements thereto" were signed by Suppes,

b.   approximately 30 demands for assignment with the "all improvements thereto" were not signed by Suppes, and

c.   approximately 50 inventions did not mature to the University demanding "all improvements thereto".

78.   For the signed assignment forms, "all improvements thereto" restrains the trade of Suppes in broad areas related to modeling, simulation, and characterization of polymers and polymer reactions wherein Suppes has vested thousands of dollars of personal money and years of effort in establishing expertise.

79.   Assignment forms requiring "all improvements thereto" were approved by University Counsel including attorneys Owens, Knedlik, and Hoskins as documented in an email by C. Fender ("Fender") on April 28, 2014.

80.   Suppes protested to Fender about the assignment form language and that the CRR did not provide the University the right to prescribe assignment forms.

81.   Despite Suppes' written protests of concerns, the University continued to demand assignment of "inventions" and of "all improvements thereto".

82.   In the Cause-for-Dismissal trial from December of 2016 to May of 2017, Suppes was accused of insubordination for not signing assignment forms and was found guilty of insubordination; his tenure was revoked and his employment was terminated on May 25, 2017.

Case 2:18-cv-04230-MDH   Document 1   Filed 11/09/18   Page 14 of 42

The forms Suppes refused to sign contained demands for "all improvements thereto".

83. The Conversion was: a) substantial, b) performed under the auspices of patent law, and c) perpetually denies Suppes monetary benefit from patent on broad areas of new inventions even after his University employment was terminated.

84. University staff improperly and intentionally took rights from Suppes and attempted to take rights away from Suppes.

85. Damages from employment termination and from perpetual inability to monetarily benefit from patents in broad areas of new inventions was realized on May 25, 2017.

86. Refusal to sign University-demanded assignment terms was used against Suppes by the University in The-Lawsuit.

87. The jury of The-Lawsuit was not provided the whole truth on why Suppes did not sign assignment language for Suppes' inventions, and the jury was biased due to not being provided the whole truth.

88. Damages included but were not limited to attorney fees, costs associated with The-Lawsuit, loss of income, loss of health insurance, loss of retirement benefits, loss of royalty income, loss of value in company assets, loss of access to a properly equipped research lab, loss of Suppes' discretionary University research salary moneys, patent fees and costs, fines inflicted upon Suppes in excess of $600k, mental anguish, and alienation from professional and social communities.

## COUNT IV - RESTRAINT OF TRADE INCLUDING DENIAL OF RIGHT TO ATTAIN RIGHTS TO REVENUE BENEFIT OF PATENTS ON NEW INVENTIONS
### (Against the Curators)

Plaintiff incorporates the proceeding paragraphs by reference herein.

89. Contract Conversions wrongfully denied Suppes' rights to earn benefits of patents on improvements to inventions assigned to the University.

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 15 of 42

90. The University's intentional failure to timely decide whether or not to assert rights on inventions caused damages to Suppes.

91. The University's intentional failure to assert rights in the method prescribed by CRR100.020(E)(2)(i) caused damages to Suppes.

92. The University's failures caused the unnecessary escalation of disputes up to and including termination of employment.

93. Damages to Suppes included but were not limited to attorney costs and fees and loss of income/benefits.

## COUNT V - RESTRAINT OF TRADE INCLUDING DENIAL OF RIGHT TO ATTAIN RIGHTS TO REVENUE BENEFIT OF PATENTS ON NEW INVENTIONS
### (Against the Owens, Hoskins and Jones)

Plaintiff incorporates the proceeding paragraphs by reference herein.

94. In The-Lawsuit, Jones and Hoskins pursued judgment against Suppes on inventions where The University demanded that Suppes assign in perpetuity "all improvements thereto", and where lack of assignment was presented as a breach of contract.

95. As the supervisor of Hoskins, Owens was at least complicit in the actions of Hoskins.

96. The jury of The-Lawsuit was wrongfully not provided the whole truth on why Suppes did not sign assignment language for Suppes' inventions, and the jury was biased due to not being provided the whole truth.

97. Damages to Suppes included attorney costs and fees, improperly awarded damages of over $700,000 against Suppes, public humiliation, and loss of income.

## COUNT VI - RESTRAINT OF TRADE INCLUDING DENIAL OF RIGHT TO RECEIVE BENEFIT OF PATENTS ON NEW INVENTIONS
### (Against the Owens, Hoskins and Jones)

Plaintiff incorporates the proceeding paragraphs by reference herein.

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 16 of 42

98. In The-Lawsuit, Jones and Hoskins pursued and received judgment for perpetual payment of revenues by Suppes ("Declaratory Judgment 3") per the following:

> 3. Pay over to Plaintiff University all revenue and other consideration received by Defendant Suppes, including but not limited to license/option fees, milestone fees, royalty payments and sales revenues, from the licensing, assignment, sale or other transfer of the inventions contained in the sworn statement described in Paragraph 1 above, other than for such inventions for which Plaintiff University previously has provided to Defendant Suppes a written waiver or a written assignment or reassignment;

99. Declaratory Judgment 3 is perpetual since it is based on "inventions" which are not bound by expiration dates; said perpetual nature is wrongful to Suppes.

100. As pertaining to unpatented inventions or patents after expiration, Declaratory Judgment 3 wrongfully only constrains Suppes' trades since patent infringement laws do not apply to inventions outside patent protection.

101. Hoskins and Jones, wrongfully, failed to provide the judge of The-Lawsuit the whole truth on the implications of the Declaratory Judgment 3, which was written in collusion of Jones and Hoskins.

102. The judge was biased due to not being provided the whole truth; said bias was wrongful to Suppes.

103. Sometimes, improvements on inventions of the Judgment would be included in the Declaratory Judgment 3 since the transfer of an improvement to an invention includes the original invention.

104.

105. Damages to Suppes included but were not limited to attorney costs and fees, loss of income, and costs associated with the inflicted mental anguish.

## COUNT VII - FRAUD AND DECEIT
### (Against the Owens, Hoskins and Jones)

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 17 of 42

Plaintiff incorporates the proceeding paragraphs by reference herein.

106. In about August of 2015, the honorable Judge M. Douglas Harpool instructed to the Curator's attorneys:

> [Case No. 15-4095-Cv-C-MJW,SUPPES vs CURATORS, DOC 38, page 108, lines 4-8] THE COURT: You need to tell the general counsel of the university that and you need to tell the Board of Curators that. There's nothing in here [referring to the CRR] that says we don't have to make a decision [on whether or not to assert rights to an invention] until we're in a position to legally protect our rights.

107. This interpretation is further substantiated by CRR 100.020(E)(2)(i) which implies an obligation that the University should either assert rights in the form of patenting in a reasonable time or release the invention back to Suppes, per the following:

> In the event the report of the Invention or Plant Variety is submitted to an entity organization for marketing of patent rights with which the Curators have approved a continuing contract and that entity advises that it is not to the best interests of the University to seek a patent thereon, the President shall within a reasonable time seek other means of obtaining a patent or release the rights of the Invention to the Employee-inventor.

108. Declaratory Judgment 3 included the University gaining benefit of 15 inventions where the formal status of the 15 inventions remained as "processing".

109. Jones and Hoskins intentionally wrote Declaratory Judgment 3 in terms of "other than for such inventions for which Plaintiff University previously has provided to Defendant Suppes a written waiver or a written assignment or reassignment." as a false representation that the University had decided that the 15 inventions listed as "processing" were made in Suppes' duties to the University.

110. In fact, the University had not identified the 15 inventions as made in Suppes' duties to the University, and the University had not decided to assert rights.

111. No University resources were used in the conception of the 15 inventions.

112. The 15 inventions are not in the area of chemical engineering.

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 18 of 42

113. The wrongful false representation of Hoskins and Jones was one of omission to the court with damages to Suppes.

114. The court followed the recommendation of Hoskins and Jones. Suppes was harmed by Declaratory Judgment 3 where the University failed to assert that the 15 inventions were made in the scope of Suppes's duties to the University.

115. The wrongful omission was made despite the 2015 warning by Judge Harpool.

116. Suppes asserted inventor rights to ownership by filing for patent on approximately eleven of fifteen inventions disclosed to the University in September and December of 2016.

117. Suppes submitted non-assertion forms to the University in December of 2016 and January of 2017, initiating the process for the University to decide if it would assert ownership.

118. The University did not assert ownership of the fifteen inventions where the formal status of the 15 inventions remained as "processing".

119. In The-Lawsuit, Jones and Hoskins used: a) shotgun approaches, b) ambush tactics, c) focus on character assassination rather than facts, and d) omission to overwhelm the Court toward deception and fraud.

120. The false representation included a waiver form provided to Suppes for signature in about March 21 of 2017 on 4 of the 15 inventions. The waiver form was provided to Suppes in the context of waiving rights to Suppes, but actually had Suppes give the University research rights to his inventions and possibly waived nothing back to Suppes.

121. The CRR has no provisions where the University reserves research rights for inventions made outside the scope of Suppes' duties to the University.

122. Damages to Suppes included but were not limited to attorney costs and fees and loss of income/benefits.

## COUNT VIII - VIOLATION OF DUE PROCESS, FIFTH AND FOURTEENTH

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 19 of 42

## AMENDMENTS, REGARDING SUPPES' INVENTIONS
### (Against Owens, Hoskins and Jones in her Official Capacities)

Plaintiff incorporates the proceeding paragraphs by reference herein.

123. Acting under color of state law pursuant to their offices within the University, Jones and Hoskins pursued and obtained the Judgment including an order that revenues Suppes received from the 15 inventions were to be paid to the University.

124. The decision to deny Suppes of said revenues was made wrongfully: a) without Jones and Hoskins asserting the inventions were made in the scope of Suppes' duties to the University, b) without the University asserting the University has ownership rights, and c) without Suppes being provided the opportunity to invention-specific hearings that he rightfully owned the inventions.

125. The CRR obliges the University to perform make recommendations on the status of an invention based on: a) CRR100.020(E)(2)(i), b) Judge Harpool's 2015 instruction, and c) CRR100.020(F)(2)(b) which states:

> It shall be the duty of the Patent Administrator to review and make recommendations to the President upon all Invention and Plant Variety reports, ... .

126. Jones and Hoskins wrongfully pursued court enforcement of remedies prior to obligatory University processes on the 15 inventions to identify if the University should assert rights.

127. Damages to Suppes included attorney costs and fees and loss of income/benefits.

**Dignitary and Negligence Issues of The-Lawsuit**

## COUNT XI - DECEIT, FRAUD, and/or FRAUDULENT CONCEALMENT
### (Against Hoskins, Owens, and Jones in their Official and Individual Capacities)

Plaintiff incorporates the proceeding paragraphs by reference herein.

128. As a University legal counsel, Hoskins was the University's legal counsel for

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 20 of 42

communications between the University and the patent attorney ("Cleveland") prosecuting the The-Abandoned-Application patent.

129. Hoskins was practicing legal counseling on patent matters without having passed the patent bar exam.

130. Hoskins had a clear last chance to prevent damages related to The-Abandoned-Application by recommending and/or preparing a Substitute-Statement to/for Cleveland, and Hoskins failed to act on this clear last chance.

131. During efforts to resolve issues related to patent abandonment, Hoskins communicated to other counsel that he (Hoskins) would not pursue alternatives to obtaining signatures from Suppes, and so, Hoskins intentionally did not pursue the Substitute Statement.

132. The actions of Hoskins were in bad faith including intentional deceit to cause harm.

133. Hoskins participated in The-Lawsuit litigation against Suppes knowing that he (Hoskins) had the last clear chance to prevent the damages attributed to Suppes in The-Lawsuit, and through omission and other processes Hoskins intentionally deceived the court resulting in biased judgments against Suppes.

134. The time period of the intentional concealment and/or fraud included, but may not be limited to, the trial in August and September of 2017.

135. Hoskins actions included bad faith in crafting language in drafts of agreements with Suppes and/or RA/HT, said crafted language effectively sabotaged attempts to arrive at agreement to resolve disputes and advance Glycerol-to-PG technology toward commercialization.

136. As Hoskins' supervisor, Owens was complicit in Hoskins actions.

137. Jones colluded with Hoskins in the concealment that Hoskins and Cleveland had

the capability to enable a Substitute Statement that would have prevented abandoning of The-Abandoned-Application.

138. Trail transcripts of The-Lawsuit document Jones attributing about $3.7 million in damages as a result of the USPTO posting The-Abandoned-Application as abandoned.

139. Damages included but were not limited to lost royalty income, legal costs, legal fees, lost equity in RA/HT, improperly allocated fines against Suppes, mental anguish, and as the court deems just and fair.

## COUNT X - ABUSE OF PROCESS
### (Against Owens, Hoskins and Jones, Official Capacity)

Plaintiff incorporates the proceeding paragraphs by reference herein.

140. Jones was the lead counsel against Suppes in The-Lawsuit.

141. Hoskins attended the trial of The-Lawsuit and participated in conferences with Jones during The-Lawsuit. The actions of Hoskins and Jones were mutually complicit in legal capacities of The-Lawsuit.

142. In a 1/21/09 letter distributed by Jones, the reason for The-Lawsuit was explained as "The University is unable to take any action with the Patent Office without a valid and sufficient assignment"; this written statement is false at face value as a matter of law.

143. The ulterior motive of Owens, Hoskins, and Jones was to save face and reputation from negligent acts they performed as a result of practicing patent law without proper qualifications; a negligence documented in this 1/21/09 letter.

144. In January of 2009, the 08-Grievance was positioned to resolve key disputes of The-Lawsuit within a few months and at no external costs to the University.

145. The 08-Grievance was terminated as a result of The-Lawsuit filed by Jones, denying Suppes his employee-right to the grievance process' timely resolution of disputes.

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 22 of 42

146. Hoskins was a named defendant in the 08-Grievance giving Hoskins an ulterior motive to file a lawsuit to end the grievance.

147. The Lawsuit took more than 8.5 years with total costs over $1.5 million.

148. The stated purpose of the lawsuit of the 1/21/09 letter could have been resolved with a $30 filing fee in associate court with a declaratory judgment within a few months.

149. Jones admitted into The-Lawsuit, after the first day of the trial, evidence that implicated Hoskins in damages that Jones associated with Suppes in the trial of The-Lawsuit.

150. The-Lawsuit proceeded in its entirety under the circumstance where a party (Hoskins) responsible for the damages attributed to Suppes was part of the litigation team pursuing judgment against Suppes for those same damages. This is an additional ulterior motive for Hoskins' actions.

151. Hoskins' conflict of interest possibly violated Suppes' 14th Amendment and CRR rights to equal protection within the University's decisions on pursuit of litigated resolutions. As Hoskins' supervisor, Owens was in collusion with this possible violation.

152. Jones presented to the court Suppes' failure to sign unaltered documents in false light since many, if not all, of these documents attempted to wrongfully take away lawful and just rights of Suppes away from Suppes. Suppes was standing up for his right to assert rights on inventions he believed he justly owned.

153. Multiple statements of Jones were false and multiple statements shed false light on subjects; these statements may have led to false statements published in the Columbia Daily Tribune.

154. Suppes had and/or has a right to manage RA/HT in a manner that protected the LLC's assets. As a result of standing up for that right; Owens, Hoskins, and Jones named Homeland Technologies ("HT") had no interactions that could lead to the counts against HT.

155. The counts against HT were dismissed in summary judgment. Immediately thereafter, an amended petition was filed that restated the counts. All counts were dismissed with prejudice at the start of the trial.

156. Additional ulterior motives of The-Lawsuit and/or for improperly continuing The-Lawsuit were: a) a deceitful method to take property from HT/RA, b) saving face and/or reputation after negligently spending hundreds of thousands of dollars in The-Lawsuit, c) pursuit of dominion and/or power over Suppes and other faculty members by the Conversions, d) the lawsuit they filed was a cause for the failed commercial efforts, e) to overshadow their violations constitutional rights related to restraining Suppes' trade, and f) in demand for ownership the University acknowledged it owned possibly for the sole purpose of instilling indignity.

157. An ulterior motive of The-Lawsuit was to take property for HT through use of an improper criteria that the University owned rights to patents to which HT claimed rights. The legal standard is that both the University and HT can have rights to the same patents, and the proper legal standard to take rights from HT would be to show that HT had no rights; Owens, Hoskins, and Jones did not purse the proper legal standard for taking patent rights from HT.

158. Damages to HT included attorney costs and fees. Respective damages to Suppes were substantially equivalent to the damages to HT as a result of Suppes' equity in HT.

159. Damages included but were not limited to attorney fees, costs associated with The-Lawsuit, loss of income, loss of health insurance, loss of retirement benefits, loss of royalty income, loss of HT equity, inappropriate award of damages in excess of $600k, mental anguish, and alienation from professional and social communities.

**Federal Question and Abuse of Process Counts on the Cause-for-Dismissal**

### COUNT XI - VIOLATION OF FIRST AMENDMENT FREEDOM OF SPEECH AND PRESS
**(Against Cooper, Loboa, and Freyermuth in their Official Capacities)**

160. Plaintiff incorporates the proceeding paragraphs by reference herein.

161. The State of Missouri vested Cooper, Loboa, and Freyermuth with the authority to act under the color of law because the Cause-for-Dismissal is a legal process within the University.

162. Evidence presented in the Cause-for-Dismissal with intent of improperly biasing the CFD jury toward Suppes' employment's termination included:

    a. written statements of Suppes commenting he had seen no evidence a student deserved an award - said statements were presented as Suppes being derogatory of a student;

    b. classroom statements made identifying he [Suppes] had considerably more citations than other faculty teaching in the department; and

    c. written statements made by Suppes that certain faculty were not qualified to teach courses they had never taken.

163. The testimony of Suppes' statements and exhibits of Suppes' writings are documented in transcripts of the Cause-for-Dismissal.

164. Suppes's comments were intentionally used against Suppes in an unreasonable, retributive manner, in violation of Suppes' freedom of speech and/or press. Examples of such comments include classroom comments expressed under academic freedom and written statements made in the diligence of Suppes' job performance.

165. Damages included but were not limited to attorney fees, costs associated with The-Lawsuit, loss of income, loss of health insurance, loss of retirement benefits, and loss of royalty income.

## COUNT XII - VIOLATION OF FIFTH AND/OR FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS
### (Against Cooper, Loboa, and Freyermuth in their Official Capacities)

Plaintiff incorporates the proceeding paragraphs by reference herein.

166. The CRR provided Cooper and Loboa liberty in identifying evidence, testimony,

and their pursuits; the CRR did not require that state and/or federal court standards of due process ("Common-Standards") be followed.

167. The CRR provided Freyermuth liberty in setting standards for allowed evidence, testimony, and procedures.

168. The liberty to perform an act does not assure the act is legal.

169. Examples of Suppes' requests that were denied in the Cause-for-Dismissal, include:

    a. A request for verification that the committee serving as the jury on the Cause-for-Dismissal ("CFD-Jury") was properly elected,

    b. A request for discovery of FAIR evaluations of colleagues for comparison to his FAIR scores,

    c. A request that affidavit testimony's be not allowed in lieu of Suppes being provided the opportunity to face his accuser,

    d. A request that hearsay of anonymous witnesses not be allowed,

    e. A request to continue witness testimony of R. Schwartz on counts related to handling of inventions,

    f. A request that a written non-email document without letterhead or signature not be allowed, and

    g. A request to enforce common elements of a count as necessary for a finding of guilty

170. In most instances, Loboa and Cooper had broad access to staff and information for discovery that was not accessible to Suppes.

171. Discovery requests were made under the Sunshine Law of Missouri. Multiple Sunshine Law requests were wrongfully denied.

172. Said Sunshine Law access and respective requests are rights to civilians in Missouri; the fact that Suppes made these requests was wrongfully presented by Loboa and Cooper as a violation made by Suppes in the Cause-for-Dismissal.

Page **26** of **42**

173. Cooper, Loboa, and Freyermuth acted with intent to rebuff requests of Suppes for an improper purpose.

174. The failure to practice Common-Standards resulted in a failure to achieve substantial justice.

175. Damages included but were not limited to attorney fees, loss of income, loss of health insurance, loss of retirement benefits, fines for violation of Missouri's Sunshine Law, mental anguish, and alienation from professional and social communities where total damages are in excess of $3 million and as deemed fair and just by the court.

## COUNT XIII - VIOLATION OF 6TH AMENDMENT RIGHT TO FACE ACCUSER
### (Against Cooper, Loboa, and Freyermuth in their Official Capacities)

Plaintiff incorporates the proceeding paragraphs by reference herein.

176. In the Cause-for-Dismissal Suppes was denied his right to face his accusers on evidence including but not limited to hearsay, affidavits, unsigned documents, and written documents where the name of the accuser was omitted.

177. Suppes objected to the use of hearsay, affidavits, unsigned documents, and written documents; despite objection, Suppes was denied the right to face and question the accuser.

178. Cooper, Loboa, and Freyermuth acted purposely to deny Suppes to right to face his accusers.

179. The CFD-Jury findings included findings of guilt on harassment, coercion, and misconduct; the average person would associate these nouns as indicative of criminal activities.

180. Damages included but were not limited to attorney fees, loss of income, loss of health insurance, loss of retirement benefits, mental anguish, and alienation from professional and social communities, where total damages are in excess of $3 million and as deemed fair and just by the court.

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 27 of 42

## or in the alternative to COUNT XIII
## COUNT XIV - ADDITIONAL VIOLATION OF RIGHTS TO DUE PROCESS
### (Against Cooper, Loboa, and Freyermuth in their Official Capacities)

Plaintiff incorporates the proceeding paragraphs of COUNT XV by reference herein.

## COUNT XV - COLLUSION AND/OR CIVIL CONSPIRACY
### (Against Loboa, Pinhero, Stokes, and Cooper)

Plaintiff incorporates the proceeding paragraphs by reference herein.

181.    In about September of 2015, Pinhero filed a Faculty Irresponsibility charge (FI Charge)against Suppes for enforcement by Stokes in her capacity as University Provost.

182.    The FI Charge was on coercion of students for coursework requiring students to make suggestions on digital course content Suppes provided to the students free of charge.

183.    The FI Charge failed to substantiate that Suppes pursued or attained personal gain beyond common and acceptable intellectual gain associated with instructing a course.

184.    Suppes asked Stokes to terminate the FI Charge based on the absence of meeting the element of Suppes attaining substantial personal gain.

185.    Stokes was non-responsive to this request of Suppes.

186.    The FI Charge was under temporary jurisdiction of Loboa with a CRR-required invitation for Suppes to have a COE committee review the FI Charge and make recommendations.

187.    Suppes turned down the COE committee option since such a committee could exhibit a strong biased as influenced by Loboa's choice of committee members.

188.    Suppes asked that the FI Charge proceed to the next step in the CRR-defined process and be put before a standing campus committee.

189.    Stokes denied Suppes' request.

190.    Stokes' denial to proceed to the standing campus committee was a denial of

Suppes' right to get Faculty Advisory Authority on the well-defined topic of the FI Charge.

191. Within a few weeks Suppes turning down the COE committee option, Loboa in collaboration with Pinhero formed an ad hoc COE committee ("Ad Hoc Committee").

192. In emails documenting the formation of the Ad Hoc Committee, Suppes was referred to as the 500 lb gorilla.

193. The Ad Hoc Committee, as chaired by Pinhero, created a report substantially written by Pinhero; that report was condemning of Suppes; Suppes was referred to as an 800 lb gorilla.

194. At about the same time as the Ad Hoc Committee report was being prepared, Loboa was assigned as Relator in the Cause-for-Dismissal of Suppes.

195. In the Cause-for-Dismissal, the created Ad Hoc Committee report was used as evidence against Suppes.

196. Loboa, Pinhero, Stokes, and Cooper colluded in denying Suppes the right to Faculty Authority on the FI Charge and replaced that Faculty Authority with created evidence.

197. The Cause-for-Dismissal included irregularities, including but not limited to:

    a. use of created evidence (the Ad Hoc Committee report),

    b. falsified faculty meeting minutes,

    c. portraying of the university-required duties, like reporting of academic misconduct, as irresponsible behavior,

    d. portraying of the practice of the civil right of making a Sunshine Law requests as irresponsible, and

    e. reference to Suppes as a 500 lb gorilla, a 800 lb gorilla, toxic, and poison.

198. The charges of the Cause-for-Dismissal were presented by Cooper and Loboa in a "shotgun approach" of accusations lacking comprehensive elements consistent with Common-Standards.

Case 2:18-cv-04230-MDH　Document 1　Filed 11/09/18　Page 29 of 42

199. Damages included but were not limited to legal costs, legal fees, loss of income, loss of health insurance, loss of retirement benefits, mental anguish, and alienation from multiple professional and social communities.

### COUNT XVI - ABUSE OF PROCESS AND/OR ABUSE OF POWER
**(Against Cooper and Loboa in their Official Capacities)**

Plaintiff incorporates the proceeding paragraphs by reference herein.

200. The state of Missouri vested Cooper and Loboa with the authority to act as counsel and Relator, respectively, in the Cause-for-Dismissal as a legal process of the CRR.

201. Cooper and Loboa collaborated in identifying evidence and testimony against Suppes ("Evidence") in the Cause-for-Dismissal.

202. One or more of the following resulted in the denial of rights to Suppes:

    i. some, possibly most, of The-Evidence did not meet Common-Standards.

    ii. constitutional rights to face the accuser were denied.

    iii. violation of constitutional rights on freedom of speech and/or press were improperly represented as violations performed by Suppes, and

    iv. Suppes was denied discovery and the alternative of using Sunshine Law requests to discover facts in his defense were presented as violations.

203. Multiple Missouri Sunshine Law requests were improperly denied.

204. Cooper and Loboa presented actions that Suppes was required to perform in his official capacity, in false light, as violations.

205. Loboa denied Suppes the right to discuss allegations with her before the trail, and in so doing, denied Suppes the right to attempt to prevent the jury from being contaminated by evidence and testimony presented in false light.

206. Loboa intentionally made false statements to the jury multiple times, including

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 30 of 42

statements under oath; this testimony possibly rose to the level of lying and perjury.

207.    As a result of the process, Suppes' tenured professorial appointment at the University was terminated.

208.    Loboa and Cooper presented to the committee Suppes' failure to sign assignment forms in false light; many, if not all, of these documents attempted to take property from Suppes that rightfully belonged to Suppes; said property included but was not limited to rights to future inventions per the "improvements thereto" clause.

209.    Cooper and Loboa intentionally contaminated the jury with evidence:  a) presented in false light, b) presented in a shotgun approach toward concealing that so-called "evidence" was persistently accusations rather than facts, and c) not rising to Common-Standards of evidence.

210.    Loboa had the ulterior motive of: a) diverting attention from her improper acceptance of moneys from a Chinese corporation and b) pursuit of dominion over faculty beyond what is provided by the CRR, including dominion on faculty members' inventions.

211.    Cooper's ulterior motive was to maintain ego after an initial failure to entrap Suppes into making a threat during the March 2016 meeting toward suspension without pay.

212.    At some point, Cooper made the decision to pursue a case that was substantially, if not totally, absent of evidence rising to Common-Standards.  The evidence was more consistent with a witch trial than a modern-day courtroom.  From that point forward, money for services was ulterior motive.  Cooper was violating his Attorney's Oath, including the clause "I do solemnly swear that I will support the Constitution of the United States and the Constitution of the State of Missouri".

213.    Damages included but were not limited to attorney fees, loss of income, loss of health insurance, loss of retirement benefits, mental anguish, and alienation from professional

and social communities where total damages are in excess of $3 million and as deemed fair and just by the court.

## COUNT XVII - ABUSE OF PROCESS AND/OR ABUSE OF POWER
### (Against Freyermuth in his Official Capacity)

Plaintiff incorporates the proceeding paragraphs by reference herein.

214. The state of Missouri vested with Freyermuth the authority to act as chair of the Committee for Tenure ("CFD Jury") since the Cause-for-Dismissal is a process of the CRR.

215. Freyermuth either solely or in collaboration with others had the last clear chance to make sure that reasonable "due" process, constitutional rights, and reasonable standards of CDF Jury instructions were not violated in the Cause-for-Dismissal.

216. The CRR provided Freyermuth liberty in enforcing the standards and process under which the Cause-for-Dismissal was conducted.

217. Freyermuth was complicit in abuse of process violations performed by Loboa and Cooper.

218. Freyermuth allowed the CFD Jury to make decisions without enforcing common legal standards that relate the name provided to a violation with the legal elements that must be met to warrant a finding of respective guilt.

219. The jury findings were summarized by System President Choi as findings of guilt of the following counts:

    A. Intimidation, harassment and/or bullying of students.
    B. Exploitation and/or coercion of students.
    C. Severe and habitual neglect of teaching duties.
    D. Insubordination regarding treatment of students.
    E. Intimidation, harassment, bullying and/or creation of a hostile work environment for faculty and staff.
    F. Intimidation and/or harassment of chairs.
    G. Intentional violation of the university's intellectual property rules and regulations.
    H. Insubordination regarding violations of the university's intellectual property rules and regulations.

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 32 of 42

I. Other misconduct relating to research.

220. Evidence toward many, of not all, of A-I counts did not meet Common-Standards on elements to justify findings of guilty as commonly associated with these descriptions.

221. Freyermuth denied Suppes reasonable discovery requests in the Cause-for-Dismissal.

222. Freyermuth had ulterior motives of: a) gaining political clout with administrators who wanted Suppes gone and b) escalating the impact of personal opinions of disapproval where accurately characterizing "personal opinions of disapproval" would not meet criteria for removing tenure. Effectively, the ulterior motive was to make sure he was on the winning side.

223. Damages included but were not limited to attorney fees, loss of income, loss of health insurance, loss of retirement benefits, mental anguish, and alienation from professional and social communities where total damages are in excess of $3 million and as deemed fair and just by the court.

## COUNT XVIII- SLANDER
### (Against Loboa)

Plaintiff incorporates the proceeding paragraphs by reference herein.

224. In the Cause-for-Dismissal, Loboa made false statements and possibly lied in her positions as Relator and COE Dean and under oath.

225. The false statements of Loboa included at least three separate accusations that Suppes torpedoed, or otherwise sabotaged, grants and/or proposals of colleagues.

226. Loboa's actions were of intent to cause damage to Suppes and biased the CFD Jury toward a recommendation to terminate Suppes' tenure and employment.

227. Damages included but were not limited to loss of income, loss of health insurance, loss of retirement benefits, mental anguish, alienation from professional and social

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 33 of 42

communities, and as the court deems fair and just.

## COUNT XIX - LIBEL
### (Against the Tribune and Keller)

Plaintiff incorporates the proceeding paragraphs by reference herein.

228. The following were printed and distributed by the Columbia Daily Tribune on the date The-Lawsuit verdict was rendered, posted Sep 6, 2017 at 6:20 PM; updated Sep 6, 2017 at 10:18 PM on the Tribune web page:

i. *Suppes also sought to market the process to Senergy's competitors, including Dow Chemical, and claimed that a firm he created, Renewables Associates, owned all the intellectual property rights to the process.*
*"What in the world made him think this was OK?" Jones asked.*

ii. *The university pays the costs of patenting the invention.*

229. The following are facts in direct conflict with statements printed and distributed by the Tribune:

    a. Suppes did not market technology licensed to Synergy to competitors.

    b. Suppes did not claim to Synergy's competitors that Renewable Alternatives owned all rights to technology licensed to Synergy.

    c. Suppes did not market technology licensed to Synergy to Dow Chemical.

    d. The firm Suppes created was not Renewables Associates.

230. The following are facts that substantiate a false light of statements printed and distributed by the Columbia Daily Tribune as written by Rudi Keller:

    a. From August 1, 2001 through 2005, the University paid no patent costs on the Glycerol patents.

    b. From August 1, 2006 through 2011, the University paid no patent costs on the Glycerol patents except, possibly, relatively small amounts on provisional patent applications that constituted less than 2% of the patent costs expended in this timeframe.

    c. It was the University's failure to pursue and pay patenting costs on the respective inventions that was the cause of problems.

Page **34** of **42**

231. The written acts of false light were written by Rudy Keller and printed by the Tribune.

232. Damages included but were not limited to mental anguish, alienation from professional and social communities, and reduced ability to gain meaningful employment and/or research grants.

## COUNT XX - DEFAMATION
### (Against the Tribune and Keller)

Plaintiff incorporates the proceeding paragraphs by reference herein.

233. The written acts of false light of the Tribune and Rudy Keller included negligence in verification of veracity.

234. The published statements on Suppes by The Columbia Daily Tribune as written by Rudy Keller wrongfully presented Suppes as undermining business interests of Senergy, a company Suppes was under obligation to work with toward commercialization of several of Suppes' inventions.

235. Critical aspects of the published statements of the Tribune were false and defame Suppes in the eyes of companies considering hiring or collaborating with Suppes, and thus damage Suppes' ability to earn income and advance future inventions toward commercialization.

236. Damages included but were not limited to mental anguish, alienation from professional and social communities, and reduced ability to gain meaningful employment and/or research grants.

## COUNT XXI - DEFAMATION
### (Against Jones, Stokes, Loboa, Cooper, Pinhero, and Freyermuth)

Plaintiff incorporates the proceeding paragraphs by reference herein.

237. Actions of Jones, Stokes, Loboa, Cooper, and Pinhero were performed with the

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 35 of 42

intent of both: a) presenting facts in false light and b) disseminating the false light to wider audiences toward the purpose of defaming Suppes.

238. At least some of the actions of Loboa, Stokes, and Pinhero were performed in vindication, retaliation, animus, and/or malice.

239. Jones presented Suppes as being a "hog", including a conveyance of greed in royalties; however, by testimony of Jones' witnesses, typical royalties were specified at around 3% of sales while the royalty of RA/HT in respective agreements was only about 0.3%. Furthermore, Suppes would receive none of the 0.2% directly, with commitments to employees that would consume that 0.2% for years in even the best case scenarios.

240. Jones' derogatory comments of false light were an intentional infliction and caused emotional stress.

241. There is great disparity between how Suppes' colleagues in his professions would interpret the nine A-I listing of finding of guilt versus the actual actions that occurred; this disparity shines a false light on the subject and is a result of the actions of Freyermuth, Loboa, and Cooper.

242. The disparities were performed on purpose, knowingly, and with intent to harm Suppes.

243. The acts of false light of Jones

244. were published in newspapers and widely-distributed emails.

245. Damages included but were not limited to mental anguish, alienation from professional and social communities, and reduced ability to gain meaningful employment and/or research grants.

### COUNT XXII - TORTUOUS INTERFERENCE WITH CLASSROOM
**(Against Pinhero)**

Plaintiff incorporates the proceeding paragraphs by reference herein.

246.    Under the CRR, a business expectancy exists between a faculty member teaching a course and students in the course. The business expectancy includes student obligations to first contact the faculty member teaching a course if the student has a concern about that course.

247.    This teacher-student business expectancy includes critical feedback to allow the teacher to fix problems in a course or course material.

248.    Under the CRR, when a student's concerns are not sufficiently met by the instructor, the next recourse is to go to the departmental chairman.

249.    Pinhero inappropriately encouraged students to go to him with concerns on the courses taught by Suppes and in lieu of providing feedback to Suppes. Pinhero was neither the instructor teaching Suppes' courses nor was he a departmental chairman in these instances.

250.    Pihnero specifically wrote an objection to voicing concerns about letting Suppes know of concerns students had in his course, the context of the objection was that it would give Suppes the chance to address concerns and fix problems.

251.    Pinhero's actions, as a third party, interfered with critical aspects of the student-faculty relationship and caused deterioration of relationships between Suppes and students in his (Suppes') classes.

252.    Pinhero's actions were with ill intent. Pinhero proceeded to document the actions and wrongfully attempt to incur disciplinary actions against Suppes through communications to the departmental chairman the COE Dean and through filing of a FI Charge against Suppes.

253.    Damages included but were not limited to attorney fees, costs associated with The-Lawsuit, loss of income, loss of health insurance, loss of retirement benefits, loss of royalty income, loss of company value, inappropriate award of damages in excess of $600k, mental anguish, and alienation from professional and social communities.

**Punitive and Cumulative Counts**

### COUNT XXIII  INTENTIONAL INFLICATION OF EMOTIONAL STRESS
#### (Against Cooper)

Plaintiff incorporates the proceeding paragraphs by reference herein.

254.    Cooper repeatedly and wrongfully requested that an armed guard be placed in the room during CFD Jury hearings; each request was denied.

255.    The requests for armed guards went against University precedents and were without reasonable provocation.

256.    Campus police called Suppes, went to Suppes' house, and interrogated Suppes; all without reasonable provocation.

257.    The actions of Cooper were intentionally performed to cause emotional stress and to gain advantage over Suppes in the Cause-for-Dismissal.

258.    Damages included but were not limited to attorney fees, costs associated with The-Lawsuit, loss of income, loss of health insurance, loss of retirement benefits, and loss of royalty income.  Damages include punitive damages per a separate punitive count.

### COUNT XXIV - VIOLATION OF U.S. CONSTITUTION FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE
#### (Against  Owens, Hoskins, Stokes, Loboa, Cooper, Jones)

Plaintiff incorporates the proceeding paragraphs by reference herein.

259.    Enforcement of criteria in the CRR were arbitrarily applied to Suppes as opposed to evenly applied to University staff.

260.    Loboa, Stokes, and Owens acted in the color of state law, in their respective authorities in pursuit of the Cause-for-Dismissal against Suppes.  Owens participated in the decision to acquire the services of Cooper in this pursuit.

261.    Owens and Hoskins acted in the color of state law, in their authorities as General

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 38 of 42

Counsel and counsel, respectively, of the University in pursuit of The-Lawsuit against Suppes; actions included acquiring the services of Jones and collusion with Jones.

262. Use of litigation by the Curators was arbitrarily pursued against Suppes as opposed to against Cleveland, MSMC/MRDF, and Hoskins.

263. Arbitrary applications were performed knowingly and with intent to harm Suppes.

264. As a matter of law, Suppes did not cause The-Abandoned-Application and damages attributed to The-Abandoned-Application in The-Lawsuit.

265. Cleveland caused The-Abandoned-Application by not filing a Substitute Statement; the Curators did not pursue litigation against Cleveland.

266. Hoskins caused The-Abandoned-Application by failing to prepare and instruct the use of a Substitute Statement; the Curators did not pursue litigation against Hoskins.

267. MSMC/MRDF caused The-Abandoned-Application by failing to prepare and instruct the use of a Substitute Statement; the Curators did not pursue litigation against Hoskins.

268. The MSMC/MRDF and Senergy Chemicals suffered losses as a result of The-Abandoned-Application caused by Cleveland, but they did not pursue litigation against Suppes.

269. Pinhero with collusion of Loboa created a report for use as evidence and used name-calling as emotional pleas.

270. For all years of employment of Suppes, the COE used the FAIR evaluation form; however, in the Cause-for-Dismissal, Loboa and Cooper arbitrarily emphasized other evaluation criteria that is not applied to other COE faculty.

271. Multiple counts of The-Cause-for-Dismissal were arbitrarily pursued by Loboa and Cooper against Suppes rather than other faculty who:

    a. did not report inventions,

    b. perform their duties on reporting cheating,

c.   do not have class at all listed class times,

d.   have poorer FAIR evaluations than Suppes, and/or

e.   perform their duties on assessing student performance;

272.   the Curators did not pursue dismissal of other faculty performing similar or greater violations or who simply performed their job as was the case with Suppes for "b" and "e".

273.   Suppes' inventiveness was used against him in the Cause-for-Dismissal; however, inventiveness is not an evaluation criteria; nobody has ever been fired at the University for not inventing.

274.   The Curators did not pursue termination of Loboa's employment for purported illegal receipt of moneys from a Chinese corporation.

275.   Arbitrary criteria were wrongfully applied to Suppes.

276.   Actual damages include actual costs of attorney fees and costs associated with The-Lawsuit, attorney fees and costs associated with the Cause-for-Dismissal, and lost income and benefits.

## COUNT XXV - BREACH OF CONTRACT:  ARBITRARY ENFORCEMENT OF CRR AND LITIGATION
### (Against  the Curators)

Plaintiff incorporates the proceeding paragraphs by reference herein.

277.   The CRR states that the University will not violate rights of employees as provided by law, U.S. Constitutional. and Missouri Constitutional rights.

278.   Incorporated herein by reference as specifically applicable to this COUNT are the allegations of the count on VIOLATION OF U.S. CONSTITUTION FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE.

279.   Actual damages include actual costs of attorney fees and costs associated with The-Lawsuit, attorney fees and costs associated with the Cause-for-Dismissal, and lost income

Page **40** of **42**

and benefits.

## COUNT XXVI - PUNITIVE ASPECTS OF CONSTITIONAL RIGHTS VIOLATIONS
### (Against  Hoskins, Jones, Stokes, Loboa, Cooper, Owens, and Pinhero)

Plaintiff incorporates the proceeding paragraphs by reference herein.

280.   Punitive awards may apply to violation of constitutional rights, to economic torts, and to dignitary torts.

281.   Defendants' actions were performed with intent to stop Suppes from practicing and/or benefiting from rights Suppes had by law, by contract, and/or through the U.S. Constitution.

282.   Defendants actions were also performed for one or more of the following improper purposes:

      a.    personal gain of power, influence, and/or dominion over other Suppes,

      b.    to decrease Suppes' professional credibility,

      c.    for retribution,

      d.    to unreasonably and unnecessarily increase Suppes' legal fees and costs,

      e.    to make an example of Suppes as a warning to others, and/or

      f.    to conceal their criminal conduct or civil liability.

283.   Actions were performed  in each defendant's individual and/or official capacity on a person-by-person basis.

284.   Punitive damages are sought as the court deems appropriate and fair and as a method to deter repeat of such activity in society.

## Declaratory Judgments

## COUNT XXVII - DECLARATORY JUDGMENT RELATED TO FIFTH AMENDMENT SECURITY OF OWNERSHIP OF PROPERTY
### (Against the University)

Case 2:18-cv-04230-MDH    Document 1    Filed 11/09/18    Page 41 of 42

285.    Plaintiff incorporates the proceeding paragraphs by reference herein.

286.    It is still possible for Suppes to attain patent on about ten of the fifteen inventions listed as "processing" by the University.

287.    These about ten inventions were made outside the scope of Suppes' duties to the University and without use of University resources.

288.    Suppes seeks declaratory judgment that the University has no rights to revenues from the inventions listed as "processing" per Attachment 3.

## COUNT XXVIII - DECLARATORY JUDGMENT TO PRINT RETRACTIONS
### (Against Tribune)

Plaintiff incorporates the proceeding paragraphs by reference herein.

289.    To a limited extent, The Tribune is able to reduce the future impact of their publications violations and to correct the false light shown by their publications.

290.    A declaratory judgment is requested that the tribune is to publish retractions and apologies as related to all errors.  The retractions are to be in all newspapers and postings of the original articles and are to be of similar format and prominence as the printings containing errors. As possible, archived publications are to have erroneous statements removed with reference and link to published retractions and apologies.

WHEREFORE, Suppes respectfully requests that this Court enter final judgment and permanent injunctive relief in favor of Suppes and against Defendants as follows:

(a)  as described in each respective count

(b) with granting such further relief as this Court deems just and proper.

Respectfully Submitted,
Galen J. Suppes, Pro Se

/s/ Galen J. Suppes
4 Bingham, Columbia, Missouri 65203
Telephone:  573-673-8164
